UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
                                                       :

GERARD BASQUIAT, as Administrator,     :
of the Estate of Jean-Michel Basquiat, Deceased,   :
                                                       :
                       Plaintiff,                     :           04 Civ. 1369 (GEL)
                                                         :
            v.                                 :           **OPINION AND ORDER**
                                                          :
SAKURA INTERNATIONAL,               :
                                                         :
                       Defendant.               :
------------------------------------------------------------x

James P. Cinque, Cinque & Cinque, P.C., New York,
NY, <u>for plaintiff</u>.

Michael P. Eisenman, Miller and Eisenman, LLP,
New York, NY, <u>for defendant</u>.

GERARD E. LYNCH, District Judge:

      Plaintiff, Gerard Basquiat, Administrator of the Estate of Jean-Michel Basquiat ("Basquiat"), brings this common-law fraud action against Sakura International ("Sakura"). Plaintiff alleges that he was fraudulently induced into signing and renewing a licensing agreement based on certain misrepresentations made by defendant about its distribution networks and past royalty payments. Defendant now moves for summary judgment against plaintiff, arguing that the record demonstrates that it did not make these representations, and even if it had, that plaintiff could not have reasonably relied on the statements. The Court held oral argument on the summary judgment motion on May 4, 2005. The motion will be granted in part and denied in part.[1]

---

[1] Plaintiff's complaint also asserts claims of unlawful appropriation, unjust enrichment, rescission, and imposition of a constructive trust. (<u>See</u> Compl. ¶ 27-34.) However, his brief in opposition to defendant's summary judgment motion fails to respond to defendant's persuasive

## BACKGROUND

On May 22, 2002, Gerard Basquiat, Administrator of the Estate of Jean-Michel Basquiat, a critically-acclaimed artist who died at a young age, entered into a license agreement ("Initial Agreement") with Sakura, a Japanese company that predominantly does business in Southeast Asia. (Ideriha Aff. ¶ 1.) The Basquiat-Sakura relationship commenced when Taro Ideriha, President and Chief Executive Officer of Sakura, requested that Ulrick Trojaborg, an employee of the Estate of Keith Haring ("Haring Estate"), contact Basquiat's agent, David Stark, director of the Art Media Group, a licensing and merchandising company. (Trojaborg Aff. ¶ 15.) Stark and Trojaborg knew each other from when they both worked at the Haring Estate, and Stark was also a member of the Board of Directors of the Haring Foundation. (Trojaborg Aff. ¶ 9.) Sakura was a licensee of the Haring Estate.

At the initial meeting in October 2001, Stark and Greg Irikura, an attorney with Art Media Group, represented Basquiat. Trojaborg and Ideriha represented Sakura. (Stark Tr. 28.) The Sakura representatives expressed interest in exhibiting Jean-Michel Basquiat's artwork and licensing his artwork for use in merchandise. (Irikura Decl. ¶ 3.) Basquiat contends that he relied on two statements made by Sakura at the meeting. First, the Sakura representatives stated that Sakura did not pay royalties to any of their licensors. (Compl. ¶ 8.) Ideriha explained that Sakura did not have an accounting system in place that would accommodate royalty payments (Irikura Decl. ¶ 6), but Basquiat later learned that the Haring Estate had received royalties through a licensing agreement with Sakura. Second, Basquiat claims Sakura declared that it only

---

argument that these claims can only be maintained in the absence of a valid, enforceable contract. (See D. Mem. 15-16.) Thus, plaintiff has abandoned the claims, and judgment will be entered dismissing them.

sold its product through small boutiques, and had a distribution similar to Basquiat's other licensees, Gingham and Fotofolio, who also do business in Japan. (Compl. ¶ 8; D. Mem. 5.) Basquiat later discovered that Sakura sold much larger quantities of merchandise.

Sakura agreed to pay Basquiat a flat fee of $100,000 in return for the right to reproduce thirty-six Basquiat artworks on certain articles of clothing, such as T-shirts. (D. Mem. Ex. B; Ideriha Aff. ¶¶ 2-3.) At the time, Basquiat believed that Sakura did not expect to make large profits from the sale of the clothing, and viewed the payment a marketing expense for Sakura, as Jean-Michel Basquiat's art would bring cachet to the company (Irikura Decl. ¶ 5). Defendant asserts that all parties understood the fee to be high because the license was viewed as an investment by Ideriha. (Trojaborg Decl. ¶ 23.) The term of the Initial Agreement commenced on July 1, 2002, and continued through December 31, 2003. The contract also contained an accounting provision, whereby Sakura would provide a financial statement every six months regarding the number of products sold. The Initial Agreement also included an option for Sakura to renew the license agreement with Basquiat. (See D. Mem. Ex. B ¶ 4, 11.)

In the fall of 2003, the parties discussed renewing the licensing agreement. On behalf of Basquiat, Stark requested overdue accountings required by the licensing agreement, but did not receive them. Basquiat contends that Stark asked Trojaborg whether there had been any material changes in Sakura's business arrangements, and was told that there were none. (P. Mem. 2; Stark Tr. 68.) Sakura intended to exercise its option to renew the licence agreement, but since it sought to modify the agreement to include "polo shirts" as a permissible product, the parties renegotiated an enhanced $120,000 flat fee. (D. Mem. Exs. B, D.) Despite not having received any accountings from Sakura, Basquiat signed the renewed agreement ("Renewal Agreement")

3

on September 22, 2003. The term of the Renewal Agreement commenced on January 1, 2004, and continued through June 30, 2005. (D. Mem. Ex. D.)

On December 16, 2003, Basquiat received the first accounting from Sakura. Basquiat contends that it was only then that he learned for the first time that Sakura had sold over one million units of Basquiat-licensed clothing, primarily through Uniqlo, a Japanese clothing chain analogous to The Gap, with over 600 stores. (P. Mem. 3; see Stark Decl. Ex. F.) Sakura contends, however, that Basquiat had long been aware of the distribution to Uniqlo because Basquiat had earlier pre-approved images to be displayed on Basquiat T-shirts to be sold in Uniqlo stores. (Trojaborg Aff. ¶¶ 38-43; see D. Mem. Exs. F-J.)

Basquiat claims that if a standard royalty rate had been included in the agreement, Basquiat would have received over $1 million in total (compared to $220,000 in flat fee payments). (Stark Decl. ¶ 10.) Basquiat subsequently filed suit in this Court.

## DISCUSSION

I.  Legal Standard

Summary judgment must be granted where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is "material" if it "might affect the outcome of the suit under the governing law," and an issue of fact is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). On a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, and the Court must resolve all ambiguities and draw all reasonable inferences in its favor. Id. at 255; Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 202 (2d Cir. 1995).

To defeat summary judgment, however, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "[C]onclusory allegations or unsubstantiated assertions" will not suffice. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). Rather, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). See Matsushita, 475 U.S. at 587 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") (internal quotation marks omitted).

To state a claim for fraud under New York law, plaintiff must show that: (1) the defendant made a material false representation; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation; and (4) the plaintiff suffered damage as a result of such reliance. Eternity Global Master Fund, Ltd. v. Morgan Guar. Trust Co. Of N.Y., 375 F.3d 168, 186-87 (2d Cir. 2004). The party alleging fraud must also satisfy the requirements of Fed. R. Civ. P. 9(b), which provides that plaintiff must: (1) specify the statements that were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. Acito v. IMCERA Group, 47 F.3d 47, 51 (2d Cir. 1995).

II. The Initial Agreement

Plaintiff alleges that he was fraudulently induced into a licensing agreement with Sakura, and that Sakura made two false representations during the negotiations for the Initial Agreement: (1) that Sakura had never entered a royalty-based licensing agreement; and (2) that Sakura had only sold to small retail boutiques similar to Basquiat's other Japanese licensees, Gingham and

5

Fotofolio. Plaintiff presents evidence, which Sakura does not dispute, that Sakura had in fact paid royalties to one artist, the Haring Estate. Plaintiff also contends that Sakura's distribution was not small, pointing to evidence of their substantial sales to Uniqlo, a large clothing store chain in Japan.[2] Plaintiff argues that defendant had a duty to disclose the truth of its royalty arrangements with other licensors, and the actual extent of its distribution network. Defendant denies making these statements, and asserts that even if it did, plaintiff could not have reasonably relied on the statements.

A. False Statements

Pointing to the deposition of Basquiat's agent Stark, defendant contends that plaintiff provides no evidence that defendant made the alleged statements. For example, Stark testified that at the meeting on October 16, 2001, there were no "discussions about the manner in which Sakura did business" (Stark Tr. 34), that there were no discussions of companies named Gingham or Fotofolio (id. 35), and that there was no discussion of paying a flat fee or royalty. (Id. 35-36.) While Stark testified that Trojaborg said that Sakura did not pay royalties, he does not make clear whether Trojaborg stated that Sakura had never in fact paid royalties, or if it just had a policy against it. (Id. 40-41; see also Stark Decl. ¶ 6 ("I had a conversation with Mr. Trojaborg during which he told me that Sakura does not pay royalties.").) When asked if Gingham was only selling to "small retail boutiques," Stark also stated that he didn't know what

---

[2] Defendant presents evidence that Sakura was able to secure the deal with Uniqlo in December 2002, seven months after obtaining the Basquiat license. (Ideriha Tr. ¶ 15; Oral Argument Tr. 20.) If the jury finds this fact to be true, then Uniqlo was not part of Sakura's distribution at the time of the Sakura-Basquiat negotiation. Plaintiff argues that a jury could infer that Sakura was working on the Uniqlo deal at the time of the Sakura-Basquiat negotiation, and hid this fact from plaintiff. (Oral Argument Tr. 21.) This argument, as plaintiff admits, is weak (see id.), but plausible, thus creating an issue of fact suitable for a jury.

"small" means, and that small is difficult to quantify. (Stark Tr. 46-47.)

While Stark's deposition offers little support for plaintiff's claims, other evidence exists from which a jury could find that Sakura did make the statements at issue here. Defendant ignores the testimony of Irikura, Basquiat's lawyer during the negotiations, who does recall statements by Ideriha and Trojaborg about Sakura's distribution and royalty arrangements.[3] Irikura states in his deposition:

> We knew the numbers from Gerard [Basquiat] about the Gingham licenses. They were kind of small and Sakura said we are basically like Gingham and Fotofolio; we don't move a lot of product; we sell through small boutiques; we don't have a big distribution system in place. . . . [T]here was the comparison to Gingham and Fotofolio. They assured us, yes, they had the same type of the distribution. They didn't have massive distribution in Japan. When asked about royalties, licensing 101, Taro [Ideriha] said that they did not pay any of their other artists royalt[ies]. They do not have a royalty accounting system in place that would accommodate the payment of royalties.

(Irikura Tr. 13-15; see also Irikura Decl. ¶ 4.) While Irikura's deposition is short, he specifically states that Sakura assured Basquiat that Sakura sold clothing only to small boutiques. Moreover, Irikura's testimony is clear that the Sakura representatives did not merely take a negotiating position that Sakura does not as a matter of policy pay royalties, but made specific factual representations not only that Sakura did not pay royalties "to any of [its] other artists," but also that Sakura did not have the capacity to account for royalties. While Irikura's testimony is undeveloped, it is sufficient to create an issue of fact about whether the alleged false statements were made.

---

[3] At the oral argument, defendant's counsel "do[es] not deny that Mr. Irikura came forward and said that he seems to recall that there were these discussions." (Oral Argument Tr. 3.)

7

B. <u>Reasonable Reliance</u>

Defendant argues that even if the statements had been made, plaintiff could not have reasonably relied on those statements. Under New York law, if a party "has the means available to him of knowing, by the exercise of ordinary intelligence, the truth, or the real quality of the representation, he must make use of those means." <u>Danann Realty Corp. v. Harris</u>, 184 N.Y.S.2d 599, 603 (1959). <u>See also</u> <u>Keywell Corp. v. Weinstein</u>, 33 F.3d 159, 164 (2d Cir. 1994) (same). If plaintiff "should have discovered the facts . . . [then] any reliance under such circumstances therefore would be unjustifiable." <u>Royal Am. Managers v. IRC Holding Corp.</u>, 885 F.2d 1011, 1016 (2d Cir. 1989).

Defendant contends that plaintiff was in a position to verify the truth of the statements allegedly made by its representatives. (D. Mem. 6.) First, defendant argues that Stark was aware of Sakura's license with Haring, and privy to the terms of the agreement as a member of the Haring Foundation Board of Directors; therefore, Basquiat should have been aware, through Stark, of past royalty payments to Haring. At best, however, there are contestable issues of fact as to whether Stark had any knowledge of the Haring licensing contract, and as to whether any knowledge he might have had could be imputed to Basquiat. If Stark had unrestricted access to the Haring Estate files, and this knowledge could be imputed to Basquiat, then this knowledge arguably could preclude a finding of justifiable reliance. <u>See</u> <u>Grumman v. Allied Indus., Inc. v. Rohr Indus., Inc.</u>, 748 F.2d 729, 739 (2d Cir. 1984) (finding that reliance was unjustifiable because plaintiff "enjoyed unrestricted access" to all relevant information). Stark, though, was no longer associated with the Haring Estate at the time of the license agreement between Haring and Sakura. (Stark Tr. 37.) Stark continued to be a board member of the Haring Foundation, a

8

separate entity distinct from the Haring Estate.[4] While Stark admitted that he had the authority to view the licensing agreements entered into by the Haring Estate as a board member of the Haring Foundation (see Stark Tr. 18), there is no evidence that he actually did see them. Moreover, Stark testified that he did not have unrestricted access to the Haring Estate files. (Stark Decl. ¶ 2.) Stark was authorized to view the agreements on behalf of the Foundation, and it may well have been a violation of his fiduciary responsibilities had he sought to review Estate information not for purposes of the Haring Foundation, but for the benefit of a third party. (See Stark Decl. ¶ 2 (explaining that the agreement between the Haring Estate and Sakura was "confidential").) Therefore, Stark's affiliation with the Haring Estate is insufficient to demonstrate that plaintiff should have known about the details of the past Haring-Sakura licensing agreement.

Second, defendant argues that plaintiff could have learned certain facts about its product distribution through simple means such as the Internet. Basquiat was represented by experienced businesspeople with the ability to inquire and research information relevant to the deal they were negotiating. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, New York courts are particularly disinclined to entertain claims of justifiable reliance." Grumman Allied Indus., 748 F.2d at 737. Sakura asserts that Sakura was selling to Beams, a chain with over sixty stores, whose size was easily confirmable over the Internet. (D. Mem. 7; see also Oral Argument Tr. 12 (defendant alleging that Uniqlo's size could also be confirmed through the Internet).) Plaintiff, however, provides some evidence that Basquiat and his agents did not have a way to verify the

---

[4] The Haring Foundation, a charitable foundation which distributes the Haring Estate's assets to underprivileged children and AIDS organizations, is a residual beneficiary of the Haring Estate. (Stark Tr. 18; Stark Decl. ¶ 2.)

representations made by defendant. For example, Stark states that he "had no readily ascertainable way to verify the accuracy of [Trojaborg's] statements." (Stark Decl. ¶ 7; emphasis omitted.) Even if information about Beams could have been discovered by Basquiat, it is a question for the jury whether this information would be sufficient to alert a reasonable businessperson to the likelihood that Sakura's representation about its distribution network was false. While a jury certainly could find that plaintiff failed to obtain readily obtainable data regarding Sakura's distribution network and past licensing arrangements, it could also find the opposite. Thus, a finding of reasonable reliance is not barred as a matter of law.

Plaintiff cannot be found to have reasonably relied on defendant's statements if the statements are mere puffery. Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994). Courts have found statements to be puffery as a matter of law when the statements do not provide any concrete representations. See, e.g., Nasik Breeding & Research Farm, Ltd. v. Merck & Co., Inc., 165 F. Supp. 2d 514, 530 (S.D.N.Y. 2001) ("Terms like 'very high productive traits,' which do not set forth a concrete representation as to the company's future performance, are in the nature of commercial puffery and cannot form the basis for a fraud claim here.") While a factfinder could find that defendant's statements were, in fact, negotiating ploys, and not factual misrepresentations, the statements contain specific details that preclude a finding that they are puffery as a matter of law.

Moreover, if, as plaintiff alleges, defendant made false statements knowing they were false, New York law indicates that those statements are actionable. Sommer v. PMEC Assoc. & Co. Ltd., No. 88 Civ. 2537 (JFK), 1992 WL 196748, at *5 (S.D.N.Y. Aug. 5, 1992). Whether and to what extent plaintiff reasonably relied on these representations presents a factual issue for

the jury. See, e.g., Yuzwak v. Dygert, 534 N.Y.S.2d 35, 36 (4th Dept. 1988) (finding that defendant's statements that a particular horse was good for children was not puffing as a matter of law, and plaintiff's reliance on the statement was an issue for the factfinder). Therefore, when viewing the evidence in the light most favorable to plaintiff, plaintiff raises an issue of material fact on whether he reasonably relied on defendant's statements.

Plaintiff has properly pleaded the elements of fraud with sufficient specificity, and presented enough evidence to raise issues of material fact that defendant made certain false statements, on which plaintiff relied when entering the Initial Agreement. Defendant's motion for summary judgment is denied for claims relating to that Agreement.

C. Duty to Disclose

Plaintiff may not argue, however, that he was defrauded by omission. New York law requires a duty to disclose for claims of fraud based on omissions of material fact.[5] Remington Rand Corp., 68 F.3d at 1483. A duty to disclose "cannot arise simply because two parties may have been on opposite sides of a bargaining table when a deal was struck between them, for under New York law the ancient rule of caveat emptor is still alive and well." Brass, 987 F. 2d at 150. Defendant would have a duty to disclose if a fiduciary or confidential relationship existed between the parties, or if defendant made a partial or ambiguous statement requiring additional disclosure to avoid misleading the other party. Remington Rand Corp. v. Amsterdam-Rotterdam

---

[5] While plaintiff's claim is weakened without a finding that defendant owed a duty to disclose, plaintiff's fraud claim still survives. As discussed above, plaintiff also alleges that defendant made an affirmative misrepresentation of material fact, which does not require a duty to disclose. See Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuala, 991 F.2d 42, 47 (2d Cir. 1993) (explaining that proof of fraud requires either an affirmative misrepresentation of a material fact, or an omission of a material fact coupled with a duty of disclosure).

11

Bank, N.V., 68 F.3d 1478, 1484 (2d Cir. 1995).

The Second Circuit has noted that under New York law, fiduciary relationships can include "informal relationships where it can be readily seen that one party reasonably trusted another such as priest and parishioner, bank and depositor, majority and minority stockholder, and close friends or family members." Brass, 987 F.2d at 151. New York law does not extend the scope of informal fiduciary relationships to parties participating in an arms-length transaction, such as the licensing agreement negotiation at issue here. Brass, 987 F.2d at 151. See also Feigen v. Advance Capital Mgmt. Corp., 541 N.Y.S.2d 797, 799 (1st Dept. 1989) ("A conventional business relationship does not create a fiduciary relationship in the absence of additional factors not here alleged.").

Plaintiff argues that a fiduciary relationship existed between Trojaborg and Stark. Here, Trojaborg and Stark represented opposite sides in an adversarial business negotiation. Under these circumstances, considerable intimacy would have to exist between them to support a finding that their relationship was so close as to mimic a fiduciary relationship. Basquiat provides no evidence that could warrant such a finding. Basquiat makes a conclusory allegation that Stark and Trojaborg were "close friends" (P. Mem. 8), yet presents no concrete facts demonstrating that Stark and Trojaborg had a relationship of special confidence. Stark states without further elaboration that, "I believe that Mr. Trojaborg and I were close friends in 2001." (Stark Decl. ¶ 5.) Trojaborg, in contrast, provides an affidavit stating that they solely enjoyed a business friendship and had never socialized outside work-related events, had never visited each other's homes, and did not speak on the phone other than for work-related purposes. (Trojaborg Decl. ¶ 3, 7.) Basquiat offers no evidence to rebut these specific factual assertions. There is

insufficient evidence demonstrating that Stark and Trojaborg had a friendship so close as to warrant a relationship of extreme confidence and trust, similar to those found between priest and parishioner, bank and depositor, or even coach and player. See, e.g., Holmes v. Lorch, 329 F. Supp. 2d 516, 527 (S.D.N.Y. 2004) (finding that a "rational juror could conclude that [the coach] exerted significant influence over [p]laintiff, and that [p]laintiff placed a level of trust and confidence in [his coach]"). Thus, no fiduciary duty existed between Stark and Trojaborg.

A duty to disclose "may also arise where (i) one party has superior knowledge of certain material information, (ii) which is not readily available to the other party, and (iii) knows that the other party is acting on the basis of mistaken knowledge." Nasik Breeding & Research Farm Ltd., 165 F. Supp. 2d at 532. Even if plaintiff could demonstrate that defendant had superior knowledge regarding its royalty payment arrangement or distribution networks that was not readily available to plaintiff, plaintiff has made no showing, or even alleged, that defendant knew that plaintiff had acted based on any misconceptions. Instead, defendant vigorously argues that it thought that Basquiat was aware of defendant's past royalty payments to the Haring Estate, and knowledge of the size of the distribution to companies like Beams and Uniqlo. Therefore, defendant owed no duty of disclosure to plaintiff.

III. Renewal Agreement

Sakura and Basquiat renewed the licensing agreement on September 22, 2003. Because Sakura sought to include polo shirts as an additional item in the licensing agreement, Sakura agreed to increase the licensing fee to $120,000. Basquiat alleges that he was fraudulently induced into renewing the contract because Sakura assured Basquiat that there had been no changes in Sakura's distribution and licensing arrangements since the Initial Agreement was

13

signed. (Compl. ¶¶ 14-15.)

Plaintiff's claim fails as a matter of law, except as related to any claims related to the polo shirts. The licensing agreement between plaintiff and defendant permitted an automatic renewal option by defendant. The contract states: "Licensee [Sakura] shall have the right to extend the Term for the Renewal Period, subject to the same terms and conditions applicable to the Initial Period." (D. Mem. Ex. B ¶ 11.) Therefore, any claims related to the renewal of the agreement or the original terms set forth in the Initial Agreement are barred by the contract's renewal option. With respect to the Renewal Agreement, plaintiff may only bring a claim of fraud in the inducement insofar as it relates to the polo shirts, as the polo shirts were the only newly negotiated item for the Renewal Agreement.[6]

Plaintiff presents slim evidence that Sakura, in fact, made representations that its distribution network had not changed. Defendant alleges that it sought plaintiff's approval of items that it would be distributing to Uniqlo. Stark's testified that he asked Trojaborg whether "anything changed" (Stark Tr. 68), but the testimony is not specific as to whether this question referred to possible changes since their signing of the Initial Agreement, or changes since the sales to Uniqlo. Irikura's declaration merely states that he "told [Trojaborg] that it was necessary to [e]nsure the accuracy of Sakura's representations" (Irikura Decl. ¶ 8), but does not articulate what representations Sakura made. Drawing all inferences in favor of plaintiff, this testimony suffices, if only barely, to create an issue of fact as to whether defendant falsely represented that

---

[6] If at trial, a jury found that plaintiff was fraudulently induced into entering the Initial Agreement, then the jury may also find that plaintiff was fraudulently induced into the Renewal Agreement, as the defendant's right to renewal was based on a clause in the Initial Agreement. However, plaintiff's claim that he was fraudulently induced into the Renewal Agreement cannot stand on its own, for the reasons discussed, except as related to polo shirts.

its distribution of Basquiat-licensed products had not changed during the term of the Initial Agreement.

Plaintiff must also demonstrate, however, that he reasonably relied on defendant's representations when renewing the contract. Plaintiff provides evidence that Stark sent several emails seeking the accounting from Sakura provided for by the Initial Agreement. (Stark Decl. ¶ 9-10, Exs. D, E.) Sakura did not provide the accounting when requested, yet plaintiff still signed the renewal option. As discussed above, defendant had a right to renew the contract, but plaintiff was under no obligation to renegotiate the terms to include polo shirts, and could have insisted on the accounting prior to the new agreement. As with the Initial Agreement, defendant argues that plaintiff could easily have learned about the size and manner of Uniqlo's operations. Nevertheless, a jury could find that plaintiff Sakura did assure plaintiff that its distribution had not changed, that plaintiff reasonably concluded that this meant that there had been no changes since the Initial Agreement was signed, and that plaintiff reasonably could not have learned the full extent of Sakura's distribution network. Therefore, defendant's motion for summary judgment on the Renewal Agreement is denied with respect to claims related to the polo shirts.

## CONCLUSION

Defendant's motion for summary judgment is denied as to plaintiff's claims of fraud relating to the Initial Agreement. Defendant's motion is granted as to claims of fraud relating to the Renewal Agreement, except with respect to the modification of the agreement to include polo shirts. Defendant's motion for summary judgment is granted as to plaintiff's claims of unlawful appropriation, unjust enrichment, and rescission and imposition of a constructive trust.

SO ORDERED.

Dated: New York, New York
July 5, 2005

_____
GERARD E. LYNCH
United States District Judge